# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

JOSEPH RIAD,                )
                               )
                               )
        Plaintiff,       )
                               )
      v.                   )     C.A. No: S21C-02-032 MHC
                               )
BRANDYWINE VALLEY SPCA, )
Inc., A Delaware Corporation,  )
                               )
                               )
                               )
        Defendant.    )

## MEMORANDUM OPINION

Submitted: May 11, 2023
Decided: June 22, 2023

*Upon Consideration of Plaintiff's Motion for Partial Summary Judgment,*
**DENIED.**

*Upon Consideration of Defendant's Motion for Summary Judgment,*
**GRANTED.**

Heather A. Long, Esquire, Long & Greenberg, LLC, Newark, Delaware, Richard E. Schimel, Pro Hac Vice, Esquire, Law Offices of Richard E. Schimel, LLC., Bethesda, Maryland, Mickala Rector, Pro Hac Vice, Esquire, Rector Law, Kennett Square, Pennsylvania, *Attorneys for Plaintiff.*

Kevin J. Connors, Esquire, Marshall Dennehey Warner Coleman & Googin, P.C., Wilmington, Delaware, *Attorney for Defendant.*

**CONNER, J.**

## INTRODUCTION

Before this Court are Cross Motions for Summary Judgment. Joseph Riad ("Plaintiff") has moved for summary judgment regarding Count I, strict liability. Brandywine Valley SPCA ("Defendant") has moved for summary judgment regarding Count I, strict liability, and Count II, negligence. For the following reasons Plaintiff's Motion for Partial Summary Judgment is **DENIED** and Defendant's Motion for Summary Judgment is **GRANTED.**

An additional matter regarding a discovery dispute requires the Court's attention. The dispute was brought to light at the pretrial conference and led to an oral order at the conclusion of the conference, followed by a subsequent Motion for Relief. The dispute further led to a second oral order of the Court to Plaintiff that has gone unfulfilled. This issue is addressed at the end of this opinion.

## FACTUAL AND PROCEDURAL HISTORY

Defendant is a non-profit animal welfare organization that provides veterinary and adoption services. As part of its organization, Defendant takes in stray dogs, gives them needed medical care and screens them for potential adoption. Ceelo, the dog at issue, arrived at the SPCA on February 4, 2019, as an abandoned dog.[1]  After first arriving, Ceelo was noted to be very large and scared.[2]

---

[1] Def. Mot. for Summ. J. at 2.
[2] *Id.*

Staff were able to administer some medications, but one vaccination had to be postponed due to Ceelo lunging at the veterinarian.[3] On February 13, 2019, Ceelo's kennel behavior was noted to be "hard stares" or "aggressive behavior."[4] However, staff continued working with Ceelo through interaction and treats until Ceelo no longer barked or growled.[5] Ceelo was able to be leashed in the play yard with no issues.[6] Ceelo continued to interact calmly, permitted staff to handle him and even enjoyed training exercises such as "sit down" and "shake."[7]

On February 27, 2019, Laura Miles ("Miles") adopted Ceelo from Defendant.[8] After owning Ceelo for a few days, Miles brought the dog back to the SPCA on March 3, 2019, intending to return the dog because it was chasing her cats.[9] While Miles was standing in the lobby with Ceelo on a leash next to her, Plaintiff entered the facility.[10] Plaintiff had come to the SPCA that day with an interest in adopting a dog.[11] Upon coincidentally seeing Ceelo in the lobby, Plaintiff expressed an interest in him and was then given a form to fill out as a precondition to the adoption process.[12] It appears that initial form he was given,

---

[3] Id.
[4] Id.
[5] Id. at 2-3.
[6] Id. at 3.
[7] Id.
[8] Pl. Mot. for Partial Summ. J. at 3.
[9] Id. at 2.
[10] Id. at 3.
[11] Id.
[12] Id.

2

also referred to as the "Getting To Know You Questionnaire", was never completed by Plaintiff.[13]

Alexandria Floyd[14] ("Floyd") was also present in the lobby during this time.[15] According to deposition testimony of Julie Landy, CFO of Brandywine Valley SPCA, Floyd came in to the SPCA that day with Miles.[16] Floyd worked for Defendant as a Kennel Attendant and is also the daughter of Miles.[17] Since Plaintiff expressed an interest in Ceelo, Floyd took Ceelo, using the leash Miles had brought him in on, back to Defendant's play yard.[18] Plaintiff accompanied Floyd and Ceelo where he interacted with Ceelo for approximately ten minutes without issue.[19] After the interaction, Plaintiff, Floyd and Ceelo all returned to the reception area.[20]

Plaintiff remained interested in Ceelo after their positive play yard interaction, even exclaiming to the receptionist his interest in the dog.[21] Plaintiff then left the lobby and walked out to his car to supposedly retrieve his driver's

---

[13] Def. Mot. for Summ. J. Ex. L, Deposition of Julie Landy at 79.
[14] Her name in the record is unclear. She is also referred to as Alexandra Ford and Alexandria Ford many times.
[15] Pl. Mot. for Partial Summ. J. at 4.
[16] Def. Mot. for Summ. J. Ex. L at 82.
[17] Pl. Mot. for Partial Summ. J. at 4. *See also*; Ex. A, Deposition of Lauren Campbell at 5; Ex. B, Deposition of Joanna Miller at 5; Ex. C, Deposition of Julie Landy at 6.
[18] The play yard is an area within the BVSPCA facility where potential adopters can interact with available dogs outside of their kennels. Pl. Mot. for Partial Summ. J. at 4.
[19] *Id.*
[20] *Id.*
[21] *Id.* at 5.

license.[22] Upon returning, Plaintiff reached down to pet Ceelo and Ceelo bit Plaintiff's hand.[23] Plaintiff then hurried away.[24] After Ceelo bit Plaintiff, Floyd removed the dog from the lobby area.[25] Records reflect that shortly after the bite occurred, Ceelo was transferred into Defendant's custody by Miles signing the Return Contract.[26]

Plaintiff filed his Motion for Partial Summary Judgment on August 31, 2022. Defendant filed its Motion for Summary Judgment on August 31, 2022. The Court held a pretrial office conference with the parties on November 3, 2022, where concern was expressed over Plaintiff's lack of response to Defendant's assertion regarding the need for expert testimony to establish negligence. Plaintiff admitted his failure to respond to the need for an expert, explaining it was due to not retaining an expert and the negligence claim not being Plaintiff's focus, as it is the weaker of the two claims. After the Court made its position known, Plaintiff was permitted to submit supplemental briefing on the need for expert testimony in relation to Defendant's alleged negligence. Plaintiff submitted his Memorandum of Law as to Negligence Claim on December 2, 2022. Defendant replied on January 11, 2023.

---

[22] *Id.*
[23] Pl. Mem. of Law as to Negligence Claim Ex. 4.
[24] The incident is caught on surveillance video from Defendant's lobby cameras. The Court was able to watch what occurred. *Id.*
[25] Def. Mot. for Summ. J. Ex. L at 93.
[26] *Id.* at 95.

Also at the pretrial conference, Defendant raised a discovery issue regarding Plaintiff's lack of response for Plaintiff's financial records, specifically Plaintiff's taxes. Counsel for Plaintiff represented they would produce the taxes. The Court held oral argument on all issues on March 27, 2023, reserving its decision.

## STANDARD OF REVIEW

Motions for summary judgment are reviewed pursuant to Superior Court Civil Rule 56. The Court must determine "whether, when viewing the facts in the light most favorable to the nonmoving party, the moving party has demonstrated that there are no material issues of fact in dispute and that the moving party is entitled to judgment as a matter of law."[27] Summary judgment will not be granted if material facts are in dispute or if further inquiry into the facts is needed.[28]

Cross-motions for summary judgment do not alter the standard of review[29] nor do the cross-motions act as a *per se* concession that there is an absence of factual disputes.[30] "The mere filing of a cross motion for summary judgment does not serve as a waiver of the movant's right to assert the existence of a factual dispute as to the other party's motion."[31]

---

[27] Super. Ct. Civ. R. 56(c); *Shuba v. United Servs. Auto Ass'n*, 77 A.3d 945, 947 (Del. 2013).
[28] *Capano v. Lockwood*, 2013 WL 2724634, at *2 (Del. Super. May 31, 2013).
[29] *Id.*
[30] *United Vanguard Fund, Inc. v. TakeCare*, Inc., 693 A.2d 1076, 1079 (Del. 1997).
[31] *Id.*

5

## DISCUSSION

### I.  Strict Liability

The issue presented in Defendant's motion is whether Defendant can be held strictly liable for the injuries caused to Plaintiff. Strict liability for dog bite injuries stems from 16 *Del. C.* § 3053F, otherwise known as the Dog Bite Statute. Section 3053F states in relevant part, "[t]he owner of a dog is liable for damages for any injury, death, or loss to person or property that is caused by such dog . . . ."[32] This statutory language came to be in 1998 after "well-publicized and shocking problems caused by people who were irresponsibly keeping vicious dogs as pets."[33] The intent of the General Assembly when creating the Dog Bite Statute was the elimination of the one free bite rule.[34]

The Court concludes that the Dog Bite Statute does not apply to animal welfare organizations such as Defendant. When analyzing a statute, it is the Court's responsibility to effectuate the Legislature's intent.[35] The Legislature's intent with respect to the Dog Bite Statute is clear. The intent was "to rein in

---

[32] 16 *Del. C.* § 3053F.
[33] *Tilghman v. Delaware State Univ.*, 2012 WL 3860825, at *10 (Del. Super. Aug. 15, 2012).
[34] *Id.*
[35] *Id.*

6

irresponsible dog owners who were keeping vicious dogs as pets by eliminating the 'one free bite rule.'"[36]

In *Tilghman v. Delaware State University*, the Court held that the Dog Bite Statute did not apply to a dog that was State-owned or in State service.[37] The Court determined, consistent with the intent of the Legislature, that the Dog Bite Statute was not applicable to the working K-9 police dog because it was not a pet but instead used solely for State law enforcement purposes.[38]

Although a slightly different factual situation, the analysis for the case at hand remains the same. The intent of the Legislature can be broken down into three questions: (1) is Defendant an irresponsible dog owner; (2) is Defendant keeping vicious dogs; and (3) are the aforementioned vicious dogs being kept as pets? The answer to the first question is no. Defendant is an animal welfare organization whose sole purpose is to provide health and adoption services to stray animals, including dogs. The answer to the second question is also no. Defendant is advised and must abide by written protocols from licensed veterinarians on the appropriate evaluation and testing of dogs when they arrive at the SPCA.[39] Additionally, if an

---

[36] *Id.* at *11.
[37] *Id.*
[38] *Id.*
[39] 16 *Del. C.* § 3002F(a) states in full, "[a]nimal shelters shall be advised by a licensed veterinarian and shall adhere to a written veterinary protocol developed with a licensed veterinarian, which protocol shall include appropriate evaluation and testing of newly impounded

animal exhibits severe aggression, a licensed veterinary or other appropriately trained staff may deem it necessary to euthanize.[40] Clearly, Defendant does not keep nor place for adoption vicious dogs that are unable to benefit from treatment. Lastly, the answer to the final question is no. The purpose of Defendant's welfare organization is not to keep any of the dogs as pets. In fact, the very opposite is true. Defendant is providing welfare services to dogs until they can be adopted as pets. It is obvious Defendant is not an irresponsible dog owner who is keeping vicious dogs as pets. Accordingly, the Court will not stray from the Legislature's intent and will not apply the Dog Bite Statute to animal welfare organizations such as Defendant.

As further support for the Dog Bite Statute being inapplicable to animal welfare organizations, the Court can "determine whether public policy would be violated by the application of the strict liability statute in certain circumstances."[41] If the Dog Bite Statute were applicable to animal welfare organizations, the nonprofit's work would be essentially impossible. Regardless of the screening dogs are put through to test their temperaments, there is always a chance that a seemingly appropriate for adoption dog could become vicious and ultimately bite

---

animals, disease control and prevention, and adequate veterinary care. The protocol shall be updated as needed."
[40] 16 *Del. C.* 3004F(c).
[41] *Russo v. Zeigler*, 67 A.3d 536, 542 (Del. Super. 2013).

8

someone. Applying the Dog Bite Statute to animal welfare organizations would violate public policy.

Lastly, Plaintiff conceded at oral argument that Defendant was not an irresponsible dog owner and was not keeping Ceelo as a pet. Plaintiff vacillated whether Defendant was keeping vicious dogs.

For the reasons articulated above, Plaintiff's Motion for Summary Judgment as to Count I, strict liability, is **DENIED** and Defendant's Motion for Summary Judgment as to Count I, strict liability, is **GRANTED.**

## II.     Negligence

In order for Plaintiff to allege negligence against Defendant, Plaintiff must prove by a preponderance of the evidence that Defendant breached a duty of care owed to Plaintiff and that Defendant's breach proximately caused Plaintiff's injury.[42] However, when the standard of care involves issues that are outside the knowledge of a typical person, expert testimony is required.[43]

The Cross Motions for Summary Judgment were filed on August 31, 2022, with Plaintiff failing to identify an expert by the cutoff date of November 8, 2021. Again, at the pretrial office conference on November 3, 2022, the Court questioned Plaintiff's counsel as to their failure to respond to Defendant's assertion that an

---

[42] *Spencer v.* Goodill, 17 A.3d 552, 554 (Del. 2011).
[43] *Money v. Manville Corp. Asbestos Disease Comp. Tr. Fund*, 596 A.2d 1372, 1375 (Del. 1991).

expert was required.[44] Plaintiff's counsel responded that they did not address the expert issue in their reply brief because they did not think an expert was needed.[45] Plaintiff's counsel further stated they were more reliant on the strict liability count, as "that's the low-lying fruit in this case."[46] Plaintiff's counsel even went so far as to say they may dismiss the negligence claim, as it is the weaker claim since the dog had not shown any bad interaction that day.[47]

With Plaintiff's acknowledgment of the negligence claim being weak and Plaintiff's failure to meet the expert discovery deadline in mind, the Court allowed Plaintiff to submit a Memorandum of Law regarding the need for an expert in this case. Defendant was given a chance to respond. Plaintiff argues expert testimony is not needed because the standard of care issue in this case is within the common knowledge of a juror.[48] Plaintiff goes on to argue that, based upon some veterinarian records, Ceelo had a habit of lunging at strangers.[49] Due to this lunging habit, Defendant's employee should have held the leash tighter to ensure

---

[44] Tr. of Office Conference at 10:21-23.
[45] *Id*. at 11:1-11.
[46] *Id*. at 11:14-19.
[47] *Id*. at 12:4-9.
[48] Pl. Memorandum of Law as to Negligence Claim at 4.
[49] *Id.* at 10.

Ceelo did not lunge and subsequently bite Plaintiff.[50] Plaintiff posits that proper leash holding is within the common knowledge of a juror.[51]

Defendant argues there is more to this case than simple leash handling and restraint.[52] Defendant contends it is an animal welfare organization that places animals under specific screening tests prior to offering that animal for potential adopter interaction.[53] This screening includes temperament tests like the "EthoTest", "SAFER Test", and "Am I Safe Test."[54] The purpose of these tests is to ensure the animals do not exhibit any behavioral traits that would prohibit their adoption.[55] As previously mentioned, Defendant has to follow guidelines established by a licensed veterinarian when determining what animals are suitable for adoption.[56] Defendant argues these veterinarian established testing guidelines are outside the common knowledge of a juror and an expert is needed.[57]

The Court is in agreement with Defendant. Contrary to Plaintiff's argument, expert testimony is required to establish the standard of care applicable to the screening and adoption of dogs because laypersons are not familiar with the veterinarian established protocols employed before a dog is permitted to be

---

[50] *Id.*

[51] *Id.* at 14-15.

[52] Def. Memorandum of Law in Resp. to Pl. Memorandum of Law as to Negligence Claim at 4.

[53] *Id.*

[54] *Id.* at 5.

[55] *Id.*

[56] 16 *Del. C.* § 3002F(a), *supra* note 39.

[57] Def. Memorandum of Law in Resp. to Pl. Memorandum of Law as to Negligence Claim at 5.

adopted. Plaintiff alleges in his Complaint, amongst other things, that Defendant "knew, or should have known, that it had custody of a dog with vicious propensities and would charge at people."[58] The knowledge about what vicious propensities a dog may or may not possess stems from the tests Defendant must perform on an animal before allowing any interaction with potential adopters. These standards are curated by a licensed veterinarian and mandatory for Defendant to follow. Whether Defendant properly followed the required testing protocols with Ceelo is outside the common knowledge of a juror and must be explained by an expert.

To further Plaintiff's argument, Plaintiff suggests the negligent act was solely Floyd's failure in not holding Ceelo's leash better. Plaintiff completely disregards everything that happened with Ceelo prior. Plaintiff ignores that Ceelo was treated medically and trained to a point where adoption was possible. Additionally, Miles had Ceelo for three days without issue, except for Ceelo chasing her cats. Ceelo and Plaintiff interacted for approximately ten minutes in the play yard without incident.

In short, Plaintiff wrongly attempts to simplify the negligence claim. It is clear why Plaintiff acknowledged the weakness of the negligence claim, so much so that he even considered dismissing the claim himself.

---

[58] Pl. Compl. ¶ 27(a).

Defendant's Motion for Summary Judgment as to Count II, negligence, is **GRANTED** for several reasons. First, Plaintiff failed to respond to the need for an expert regarding the negligence claim by the deadline, and therefore waived a timely response.[59] Further, the need for an expert is obvious to establish Plaintiff's negligence claim.

## DISCOVERY DISPUTE

As mentioned above, a discovery dispute arose at the November 3, 2022, pretrial office conference. At the conference Defendant's counsel represented to the Court that it had made a request for Plaintiff's tax returns as they are important to Plaintiff's claims of substantial economic loss.[60] Defendant's counsel sought the tax returns because the bank statements and other financial documents provided by Plaintiff were not helpful to Defendant's economic expert.[61] Plaintiff's counsel stated the issue with providing Plaintiff's tax returns is that Plaintiff owns and operates a business entity called Riad Ranch and his tax returns do not reflect a

---

[59] *See Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999). ("Issues not briefed are deemed waived.").

[60] Tr. of Pretrial Conference at 3:8-23.

[61] The provided financial documents included a "Spreadsheet analysis" of foregone rental income prepared by one of Plaintiff's pro hac vice counsel, Mickala Rector, who is also Plaintiff's fiancé. *Id.*

segregation of expenses.[62] The Court expressed its feelings that Defendant was entitled to the tax returns.[63] Plaintiff's counsel responded, saying:

> **MR. SCHIMEL:** . . . [I]f the Court is insisting we produce them, we'll produce them. It's plain and simple. Frankly, I need the cover of the Court telling me that because the client is not really happy about having to do it, not that he has anything to hide, but he feels his privacy is being invaded.[64]
>
> **\*\*\***
>
> **THE COURT:** It sounds to me, and I do understand that there's a significant claim of economic loss, $3 million plus is a significant claim, and it seems to me that they're entitled to everything and in a timely fashion so their expert witness can opine on it.[65]

Later on in the conference, Plaintiff's counsel asked Defendant's counsel how far back the tax returns needed to go and Defendant's counsel responded he needed to check with his expert to ensure the appropriate years were given.[66]

---

[62] *Id.* at 5:1-5.
[63] *Id.* at 5:6-7.
[64] *Id.* at 5:13-19.
[65] *Id.* at 7:10-14.
[66] *Id.* at 20:17-19.

Almost a month after the pretrial conference, Plaintiff filed a Motion for Relief from Order on December 1, 2022, attempting to reargue the issue. In the Motion Plaintiff states he attempted to comply with the Court's order by contacting his certified public accountant, Ayman Bekheit, to determine whether it would be possible to provide both the personal and business tax returns requested by Defendant.[67] Plaintiff further explained all of his income and expenses are reflected in tax returns for his business entities.[68] If Plaintiff provided the tax returns for the holding company, the papers would not contain the information Defendant seeks as the revenue and expenses are not itemized by the different business entities Plaintiff owns.[69] Furthermore, Plaintiff is unable to provide his personal tax returns as he did not file any and they do not exist.[70] A letter from Mr. Bekheit was attached to the Motion and reiterated what Plaintiff had explained.[71] The most important information gleaned from Plaintiff's Motion for Relief from Order and the attached letter from Mr. Bekheit is that *Plaintiff represented his income and expenses are reflected in tax returns filed by his holding company.*[72]

---

[67] Pl. Mot. for Relief from Order ¶ 7.
[68] *Id.* ¶ 8.
[69] *Id.*
[70] *Id.*
[71] *Id.* Ex. A.
[72] Pl. Mot. for Relief from Order ¶ 8; *See also* Pl. Mot. for Relief from Order Ex. A. (emphasis added).

The Court noted numerous concerns with Plaintiff's Motion for Relief from Order. First, the Motion was a disguised attempt to reargue which needed to be filed within five days. Next, the Court was alarmed by the attached letter from Plaintiff's supposed certified public accountant, Ayman Bekheit. Just looking at the letter would cause an objective person concern, as the letter contains questionable syntax. Additionally, Mr. Bekheit signs the letter as accountant, not certified public accountant. The Court took the time to inquire into Mr. Bekheit's credentials and was taken aback at its discoveries. The Texas address and Florida phone number Mr. Bekheit listed on his letter appear to be associated with a Bono Transport, LLC. Furthermore, the Court was unable to find any certified public accountants by the name of Ayman Bekheit registered in Texas nor any other state. In Plaintiff's Motion Ayman Bekheit was referred to as a certified public accountant, however it does not appear that Mr. Bekheit is a certified public accountant. The Court was shocked at the lack of credential verification by Plaintiff's counsel and the grave misrepresentation in Plaintiff's Motion.[73]

---

[73] Due to the Court's numerous concerns about representations made in this case, the Court warns other courts about future Pro Hac Vice applications by Richard Schimel and Mickala Rector. Ms. Rector is engaged to Plaintiff which appears to play a role in the lack of information shared with Defense Counsel and the Court. The Court further notes local counsel needed to be more diligent in her role for ensuring the discovery process was complete and the information provided to the Court was accurate. Also, none of the attorneys representing Plaintiff took the time to verify the credentials of Plaintiff's supposed certified public account and instead took Plaintiff at his word and represented in their papers that Ayman Bekheit was a CPA. This type of practice cannot be tolerated in Delaware.

The Court held oral argument on the Motion for Relief from Order and the Cross Motions for Summary Judgment. At oral argument, the Court questioned Plaintiff about the inability to comply with the order to produce his tax returns. Plaintiff's counsel represented to the Court that Plaintiff does not file any type of tax returns for his business or himself. The Court told Plaintiff's counsel that in Plaintiff's deposition, Plaintiff was specifically asked:

> **MR. CONNORS:** Okay. Does your ranch file tax returns?
>
> **PLAINTIFF:** No.
>
> **MR. CONNORS:** Do you file tax returns –
>
> **PLAINTIFF:** Yes.
>
> **MR. CONNORS:** -- personally?
>
> **PLAINTIFF:** Yes.
>
> **MR. CONNORS:** And do you report, on your personal income tax returns, any income that you get from the operation of the farm?
>
> **PLAINTIFF:** Yes.[74]

Plaintiff's counsel was unable to provide a sound reason as to why Plaintiff testified, under oath, that he did file personal income taxes, and stated his holding

---

[74] Tr. of Pl. Dep. at 21:14-23.

company files taxes in his Motion for Relief from Order, but is now representing at oral argument that no taxes of any type are filed personally or for his business.[75] The Court again notes and takes issue with the extreme inconsistencies regarding Plaintiff's tax returns. The Court also remains confused on how Plaintiff, an individual, can reside in and own a business in the United States and somehow not file any taxes.

At the end of oral argument the Court denied Plaintiff's Motion for Relief from Order and allotted two weeks for Plaintiff to either gather both his personal and business-related tax returns or documentation from the IRS proving he does not file any taxes and turn either over to the Court. The Court made it extremely clear that it wanted to see official documentation from the IRS regarding Plaintiff's tax status. The Court also requested Defense Counsel prepare an order for the Court to sign that permitted Defense Counsel to contact the IRS and seek its own copies of Plaintiff's tax information.

On the eve of the two-week deadline, Plaintiff's counsel wrote a letter to the Court, providing a status update. Plaintiff's counsel hired a new certified public accountant, Michael Creamer, in an attempt to determine if and what Plaintiff filed in taxes. Plaintiff's counsel claimed to have been diligently working to meet the deadline but did not have control over the IRS's response time.

---

[75] *Id. See also* Pl. Mot. for Relief from Order ¶ 8.

The Court then signed the order Defendant prepared giving Plaintiff an additional 30 days to turn over: 1) Plaintiff's personal federal income tax returns for the years 2017 through 2022; 2) the federal income tax returns of Riad Ranch from 2017 through 2022; 3) the federal income tax returns for Riad Holdings from 2017 through 2022 inclusive; 4) a properly and fully completed and executed IRS Form 4506 Request for Copy of Tax Returns for the years 2017 through and including 2022 for Plaintiff's personal income tax returns; 5) a properly and fully completed and executed IRS Form 4506 Request for Copy of Tax Returns for the years 2017 through and including 2022 for Riad Ranch income tax returns; 6) a properly and fully completed and executed IRS Form 4506 Request for Copy of Tax Returns for the years 2017 through and including 2022 for Riad Holdings income tax returns; 7) a properly and fully completed and executed IRS Form 4506 Request for Copy of Tax Returns for the years 2017 through and including 2022 for Riad Ranch/Joseph Riad income tax returns that have been filed and are filed as part of a holding company as referenced in the letter dated 11/19/2022 from Ayman Bekeit; 8) federal income tax returns from 2017 through 2022 inclusive for the holding company, which Plaintiff shall identify by name, as referenced in the letter dated 11/19/2022 from Ayman Bekheit; and 9) current contact information

for Ayman Bekheit and identification of what states or jurisdictions in which he is a licensed accountant and/or certified public accountant (CPA).[76]

On the eve of the order's deadline, Plaintiff's counsel again wrote a letter to the Court providing a status update. In this letter, Plaintiff's counsel reiterates their diligent attempts to comply with the Court's order. Plaintiff's counsel attached a letter from the newly hired CPA, detailing Mr. Creamer's attempts to retrieve Plaintiff's tax information. Mr. Creamer's letter states, along with Plaintiff's counsel's letter, that Plaintiff cannot produce any tax records because they do not exist. As for Ayman Bekheit, Plaintiff's counsel forwarded a copy of his passport and a description of his accounting services to Defense counsel. However, a passport and description of accounting services, which the Court has not seen, is not a confirmation of Mr. Bekheit's status as a certified public accountant. The Court is left to assume that Mr. Bekheit is not a certified public accountant and his status as such was misrepresented in Plaintiff's papers.

It is now three months since the Court's clear order at the oral argument and subsequent orders. Plaintiff's counsel, Richard Schimmel, cannot argue he misunderstood what was requested. In fact, Mr. Schimmel disrespectfully failed to

---

[76] The Court notes the signing of the order prepared by Defendant allotted Plaintiff an additional 30 days to turn over the requested documentation on top of the two weeks of time that Plaintiff already had and thus failed to comply with the order dated April 12, 2023.

stand when stating that he understood the Court's order. At the time of this opinion, Plaintiff has still yet to supply the requested information from the IRS.

The Court refuses to continually expend judicial resources on this matter. Plaintiff has blatantly failed to comply with the Court's order to provide any documentation from the IRS detailing whether or not Plaintiff files taxes. The Court did not request a letter from an accountant stating Plaintiff's taxes do not exist. The Court specifically required documentation from the IRS. Instead of complying, Plaintiff provided the Court with a letter from another hired "accountant" and excuses.

## CONCLUSION

As discussed above, pursuant to Superior Court Civil Rule 56, Defendant is entitled to Summary Judgment on both counts of the Complaint. Strict liability is not applicable to non-profit animal welfare organizations such as Defendant. Therefore, Plaintiff's Motion for Partial Summary Judgment as to Count I, strict liability, is **DENIED** and Defendant's Motion for Summary Judgment as to Count I, strict liability, is **GRANTED.** Furthermore, Plaintiff has not only waived the negligence claim, but also failed to produce an expert, thus being unable to establish Defendant breached the standard of care owed. Accordingly, Defendant's Motion for Summary Judgment as to Count II, negligence, is **GRANTED.**

21

The Court also emphasizes if this case wasn't dismissed on the merits, it could be dismissed pursuant to Superior Court Civil Rule 37(b)(2)(C). Rule 37 states in part that the Court has discretion to issue sanctions or dismiss an action against a disobedient party for failure to obey an order to provide discovery.[77] Additionally, the Delaware Supreme Court has stated "[a] court is also vested with inherent authority to dismiss a plaintiff's action for failure to . . . comply with its rules or orders."[78] The Court is far beyond issuing sanctions in this matter. Again, the blatant disregard of the Court's order and conflicting representations push this Court to dismissal. The Court does not need to employ dismissal via Rule 37(b)(2)(C), but warns about the potential use of that Rule and its consequences.

**IT IS SO ORDERED.**

/s/ Mark H. Conner
Mark H. Conner, Judge

cc: Prothonotary

---

[77] Super. Ct. Civ. R. 37(b).
[78] *Hoag v. Amex Assurance Co.*, 953 A.2d 713, 716-17 (Del. 2008).

22